IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Donzell Thomas                 )
                                   )
          Plaintiff,      )
                                   )
                                   )
    v.                  )   No. 20 C 4564
                                   )
Samuel Chmell, et al.     )
                                   )
          Defendants.     )
                                   )
                                   )

## MEMORANDUM OPINION AND ORDER

Donzell Thomas, an inmate at Stateville Correctional Center, sues David Gomez, individually and in his official capacity as Warden of Stateville; Rob Jeffreys, individually and in his official capacity as Acting Director of Stateville; Marlene Henze, individually and in her official capacity as Medical Director of Wexford Health Sources, Inc.; the Illinois Department of Corrections; and Wexford Health Sources, Inc., alleging that they violated the Eighth Amendment by providing constitutionally inadequate medical care for ongoing symptoms he experienced after undergoing knee replacement surgery.[1] In Count I of the complaint,

---

[1] The First Amended Complaint also names as defendants Samuel Chmell, who is a doctor at the University of Illinois Hospital, and the Hospital itself, but plaintiff has dismissed these parties voluntarily.

plaintiff asserts a claim of deliberate indifference to his serious medical needs. In Count II, he claims that the injuries he alleges were caused by unconstitutional policies, practices, or customs.[2]

In separately filed motions, each defendant has moved to dismiss the complaint in its entirety. The motions are resolved as follows.

I.

The first amended complaint recounts that on September 24, 2019, plaintiff was transported to the University of Illinois Hospital ("UIH") for knee replacement surgery based on a referral by Dr. Henze. Plaintiff awoke from his surgery in "excruciating pain in the lower part of his left leg and ankle area," which a nurse said was normal and offered pain medication. Compl. at ¶ 26. An hour or so later, two resident physicians examined plaintiff's leg and said that everything looked fine.

Later that evening, two nurses came to see plaintiff and reported that the doctor wanted them to assist him in trying to walk to the door. After only a few steps, however, plaintiff became dizzy and returned to his bed, asking the nurses to inform the doctor that his leg was severely painful and hot. When a nurse returned to check plaintiff's vital signs at around 2:00 or 3:00

---

[2] Although plaintiff asserts each claim against "defendants," I construe Count I as asserting individual liability claims for deliberate indifference against each of Henze, Gomez, and Jeffreys, and Count II as *Monell* claims against Wexford and IDOC.

am, he asked for something for his pain and again told the nurse that his lower leg was extremely hot. Approximately an hour later, plaintiff received pain medication, but it was not effective. *Id.* at ¶¶ 28-29.

The next morning, September 25, 2019, plaintiff again attempted to walk with the assistance of two nurses and a walker, but he had to return to his bed after only ten steps. Despite excruciating pain and hotness in his leg, a physician told a correctional officer that plaintiff was to be discharged. Correctional staff advised plaintiff to invoke "Condition H," which he believed allowed him to receive immediate medical care at the hospital. Plaintiff attempted to exercise "Condition H," informing hospital staff that he needed to see "necessary and appropriate medical providers," but he was denied such care. Plaintiff was discharged the same day, after security or law enforcement personnel informed him that "Condition H did not apply to inmates." Compl. at ¶ 33.

Back at Stateville, plaintiff's condition worsened. The severe pain in his lower leg continued, and his leg remained "hot and began turning a dark red color." *Id.* at ¶ 36. Plaintiff returned to UIH on October 7, 2019, where Dr. Chmell, the physician who had supervised his surgery, examined him and "immediately ordered x-rays" after noting that plaintiff's leg was "unusually hot." *Id.* at ¶ 37. After the x-rays were taken, Dr. Chmell informed plaintiff

that he had two hairline fractures in his tibia/fibula that most likely occurred during his surgery and that would heal on their own in six to nine weeks.[3]

Over the ensuing weeks, plaintiff attempted physical therapy at Stateville but stopped because "the pain was too much." *Id*. at ¶ 38. He returned to UIH in late October or early November where he saw a different orthopedic doctor. This doctor told him that he did not have any hairline fractures and ordered additional scans to determine the cause of the pain and swelling in plaintiff's lower leg. *Id*. On January 29, 2020, plaintiff returned to UIH for an MRI, but the procedure was discontinued after 40 minutes because it was too painful. *Id*. at ¶ 40. The MRI was rescheduled for February 29, 2020, and was completed at that time.

After his MRI, plaintiff consulted two orthopedic surgeons at UIH who confirmed that plaintiff had no fractures in his tibia or fibula and found his results "highly suspicious for multifocal longitudinally oriented intramedullary infarcts within the proximal and distal tibial diaphysis." Compl. at ¶ 43. Both physicians found these findings "odd" and requested additional tests and the opinion of a bone specialist, stating that plaintiff's condition was

---

[3] Plaintiff alleges that "[t]his conclusion was false, and Dr. Chmell knew or should have known it to be false at the time he made it." While this allegation was presumably relevant to plaintiff's claims against Dr. Chmell and/or UIH, it does not appear to be relevant to plaintiff's claims against the remaining defendants, as he does not allege any involvement by them in the diagnosis.

4

"something they've never dealt with before." *Id*. Back at Stateville, plaintiff consulted Dr. Henze, who became "alarmed" after seeing the MRI results and told plaintiff that "infarcts" cause "death, blood clots, and heart attacks" when they get into the blood, and said further that she had never seen infarcts in the bones. Dr. Henze confirmed that plaintiff would be seen "soon" by a bone specialist. *Id*. at ¶ 44. Plaintiff believes that he was scheduled for consultation with a bone specialist in mid-April, but his appointment was canceled due to the Covid-19 shut down. In June of 2020, Dr. Henze told plaintiff that UIH's orthopedic department "did not want to see Plaintiff unless he had broken bones or was in a life or death situation." *Id*. at ¶ 46. Nevertheless, on June 24, 2020, plaintiff underwent surgery on his neck at UIH, at which time he complained that his leg was hurting and asked to be tested for signs of a blood clot. After an ultrasound confirmed the absence of blood clots, he was discharged and returned to Stateville without consulting anyone in the UIH's orthopedic department.

Plaintiff filed grievances with the Illinois Department of Corrections on October 8, 2019, April 21, 2020, and June 19, 2020, complaining about his deficient medical care. In each grievance, he complained that Dr. Henze refused to see him concerning his leg condition. As of the date of his amended complaint, i.e., February 5, 2021, plaintiff's pain in his leg was ongoing, and he had not been seen by a bone specialist. *Id*. at ¶¶ 47-48.

II.

A motion to dismiss tests the sufficiency of a complaint, not the merits of the case. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). For present purposes, I accept plaintiff's factual allegations as true and draw all reasonable inference in his favor. *See Lavalais v. Village of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). I need not, however, accept the truth of any legal conclusions plaintiff asserts. *Community Bank of Trenton v. Schnuck Markets, Inc*., 887 F.3d 803, 825 (7th Cir. 2018).

The Eighth Amendment protects incarcerated people from prison conditions that cause "the wanton and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014). "Denying or delaying treatment to an incarcerated person suffering from avoidable pain" can give rise to an Eighth Amendment claim. *Howell v. Wexford Health Sources, Inc*., 987 F.3d 647, 653 (7th Cir. 2021). To prevail on such a claim, the plaintiff must show that he 1) suffered from an objectively serious medical condition; and 2) that the defendant was deliberately indifferent to a risk of serious harm from that condition. *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016).

Section 1983 creates a private right of action against any "person" who deprives another, under the color of law, of rights guaranteed by federal law, including the Constitution. 42 U.S.C. § 1983. "A key part of § 1983's doctrinal structure is the difference

6

between individual and governmental liability." *Howell* 987 F.3d at 653. Individual liability requires personal involvement in the constitutional violation and "depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise." *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009). A local government may be liable for damages under § 1983 if the constitutional violation is caused by: "(1) an express government policy; (2) a widespread and persistent practice that amounted to a custom approaching the force of law; or (3) an official with final policymaking authority." *Howell* 987 at 653. In other words, neither an individual supervisor nor a governmental entity can be held vicariously liable under § 1983. *See Burks*, 555 F.3d at 594-95; *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).

The *Monell* doctrine governing municipal liability also applies to private corporations such as Wexford. *See Shields v. Illinois Dep't of Corrections*, 746 F.3d 782, 786 (7th Cir. 2014). Accordingly, the "critical question" bearing on Wexford's liability is whether its policies or customs caused the constitutional violations plaintiff alleges. *Glisson v. Indiana Dep't of Correction*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc).

Applying these principles in the context of Eighth Amendment claims brought by prisoners, courts have held that a non-medical prison supervisor such as a warden or prison director "is entitled

7

to relegate to the prison's medical staff the provision of good medical care," *Burks*, 555 F.3d at 595, and may be held individually liable only if he "knows of and disregards an excessive risk to inmate health or safety," *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). *See also Arnett v. Webster*, 658 F.3d 742, 757 (7th Cir. 2011) (supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye"). As for private corporations such as Wexford, because responsibility for the care of incarcerated people may be "so diffused that no individual is accountable for failures to provide adequate healthcare," *Howell* 987 F.3d at 655, "a policy to do nothing (a 'policy of inaction')" can support *Monell* liability if the plaintiff can show "that the institution made a conscious decision not to act," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 966 (7th Cir. 2019) (quoting *Glisson*, 849 F.3d at 379-80, 381)).

## Individual Liability

To survive dismissal of his deliberate indifference claims, plaintiff must allege sufficient factual material to inform the individual defendants of the basis for his claim and to raise a plausible inference that they "acted with a sufficiently culpable state of mind," which is to say, something akin to recklessness. *Arnett* 658 F.3d at 751. The first amended complaint does not cross this threshold as to defendants Gomez and Jeffreys. Indeed, it attributes no conduct at all to these defendants, whose names appear

only in the case caption and in paragraphs identifying them as parties.

"The state-of-mind element is measured subjectively: The defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Whiting v. Wexford Health Sources*, Inc., 839 F.3d 658, 662 (7th Cir. 2016). The first amended complaint does not allege any facts from which to draw an inference that Gomez or Jeffreys was aware of a serious risk to plaintiff. Plaintiff argues that Illinois law and Department of Corrections regulations establish obligations relating to inmate grievance procedures that Gomez and Jeffreys failed to discharge. Setting aside that a theory of individual liability premised on these defendants' failure to establish or conduct appropriate grievance procedures is not one that emerges from plaintiff's factual allegations (which are silent as to Stateville's grievance procedures), the Seventh Circuit "has consistently held that 42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws" or departmental regulations. *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) (internal quotation marks and citation omitted). *See also Neely v. Randle*, No. 12 C 2231, 2013 WL 3321451, at *3 (N.D. Ill. June 29, 2013) ("If there is 'no personal involvement by the warden [in an inmate's medical care] outside the grievance process,' that is insufficient to state a claim against

9

the warden.") (citing *Gevas v. Mitchell*, 492 Fed. Appx. 654, 660 (7th Cir. 2012) (alterations in *Neely*).

Plaintiff's cited authorities are not to the contrary, as the complaints in those cases asserted a factual basis beyond the mere filing of grievances to suggest that prison officials knew about and ignored the plaintiffs' serious medical needs. *See, e.g., Hardy v. Godinez*, No. 12 C 6033, 2017 WL 2569605, at *8 (N.D. Ill. June 12, 2017) ("Plaintiff's amended complaint asserts he notified each of the Defendant officials...through grievances, letters, and personal conversations about the adverse living conditions"); *Ruiz v. Williams*, 144 F. Supp. 3d 1007, 1015 (N.D. Ill. 2015) (in addition to filing four grievances, the plaintiff sent "numerous letters" to the warden regarding his medical condition and severe pain). By contrast, the complaint in this case offers no facts suggesting that either Gomez or Jeffreys actually knew about plaintiff's medical condition or had any personal involvement in the constitutional violations he alleges. Accordingly, it fails to state a claim against them under § 1983.[4]

Plaintiff has, however, pled sufficient facts to raise a plausible damages claim against Dr. Henze in her individual capacity. Assuming, as I must, the truth of plaintiff's allegations,

---

[4] Gomez and Jeffreys will remain in the case in their official capacities, however, as plaintiff seeks injunctive relief in addition to damages, and they "would be responsible for ensuring that any injunctive relief is carried out." *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011).

Dr. Henze immediately recognized the seriousness of plaintiff's "infarctus" diagnosis, which she understood as a condition that could cause "death, blood clots, and heart attacks." Given this understanding, even assuming that UIH was restricting consultations during the peak of the Covid-19 crisis and seeing only patients with "broken bones" or in a "life or death situation," Dr. Henze's own assessment of plaintiff's condition suggests that he fit that bill. Accordingly, plaintiff is entitled to discovery to investigate what steps, if any, Dr. Henze took to ensure that plaintiff receive the specialist consult she deemed appropriate, and to uncover why, a year later, plaintiff still had not been seen (and, for all that the present record reveals, still has not been seen) by a bone specialist.

<u>Governmental/Institutional Liability</u>

Although plaintiff names two separate institutional defendants—IDOC and Wexford—his complaint does not specify whose policies, practices, or customs he claims are responsible for his injuries. IDOC has not appeared in the case (although the docket indicates that it was served with process), but it must be dismissed in any event because "it is not a person subject to suit under § 1983." *Owens v. Evans*, 878 F.3d 559, 563 (7th Cir. 2017). Indeed, plaintiff's response brief clarifies that Wexford is the institutional target of his *Monell* claim. *See* Resp., DN 47 at 6-7.

The complaint alleges that the following (Wexford) "policies, practices, and/or customs" violated his Eighth Amendment rights:

- A failure to properly examine prisoners' needs for continued medical care onsite once notified;
- A failure to properly meet with prisoners to evaluate and discuss their medical conditions, complaints and needs;
- A failure to properly address prisoners' medical conditions and needs and ensure appropriate treatment and care is provided;
- A failure to properly schedule and secure follow-up medical appointments, follow orders and recommendations of medical providers; and
- A failure to provide necessary access and secure appropriate treatment with medical specialists when medically necessary.

Compl. at ¶ 61(A)-(E). Wexford argues that to survive dismissal, plaintiff must allege something more than his individual experience to suggest the existence of a policy or widespread practice, and that the facts he alleges are generally insufficient to suggest the existence of a policy or widespread practice. I disagree.

As to the first argument, while it is true that a common path toward *Monell* liability begins with allegations of "a widespread practice or custom affecting other individuals," *Howell,* 987 F.3d at 655, "[t]here is no magic number of injuries that must occur before [a defendant's] failure to act can be considered deliberately indifferent," *Glisson* 849 F.3d at 382, and "repeated deliberate

indifference toward the plaintiff" himself—which is what plaintiff asserts here—may be adequate, *Howell*, 987 F.3d at 655. As to Wexford's second argument, the very decision it cites for the pleading standard that applies to *Monell* claims, *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000), reversed the lower court's decision dismissing a complaint that contained "boilerplate allegations...entirely lacking in any factual support that a municipal policy does exist." The Seventh Circuit noted that "plaintiffs need not allege all, or any of the facts logically entailed" by their claims, and held that conclusory allegations "buttressed by facts alleging wrongdoing by the City" sufficed to state a *Monell* claim. *Id*. at 325 (internal quotation marks and citations omitted).

Here, plaintiff does more than simply parrot the elements *Monell* requires. He recounts a year-long struggle with "excruciating" leg pain and his fruitless efforts to receive a specialist appointment that Dr. Henze herself believed was appropriate based on her understanding of his apparently rare and undisputedly serious infarctus diagnosis. During this time, plaintiff repeatedly sought treatment and filed multiple grievances decrying Dr. Henze's inattention. While it may be that UIC policies and Covid-19 conditions played some role in the delay in his treatment, the facts plaintiff alleges are sufficient to raise an inference that the failure to follow up on Dr. Henze's specialist

13

referral after she acknowledged that his condition was both serious and outside her own expertise reflects a policy of inaction.

III.

For the foregoing reasons, the motion to dismiss brought by defendants Gomez and Jeffreys is granted. The motion to dismiss brought by defendant Henze is denied as to plaintiff's individual claim for deliberate indifference. The motion to dismiss brought by Wexford is denied as to plaintiff's *Monell* claim. Plaintiff may proceed on Count I as to Dr. Henze in her individual capacity and on Count II as to Wexford, and he may pursue his claim for injunctive relief.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: November 3, 2021

14