IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


Donzell Thomas                        )
                                      )
              Plaintiff,              )
                                      )
                                      )
      v.                              )    No. 20 C 4564
                                      )
Samuel Chmell, et al.                 )
                                      )
              Defendants.             )


<u>MEMORANDUM OPINION AND ORDER</u>

Donzell Thomas has been serving a life sentence at the Illinois Department of Corrections since 2006. He suffers from a number of physical ailments, including osteoarthritis and degenerative joint disease, which have caused him significant pain over the years of his incarceration. Mr. Thomas is currently housed at Stateville Correctional Center, where he claims that healthcare providers have been deliberately indifferent to his serious medical conditions and have provided constitutionally inadequate medical care, including in retaliation for grievances he filed about that care. This is one of several lawsuits Mr. Thomas has brought to vindicate his Eighth Amendment right to be free from prison conditions that cause "the wanton and unnecessary infliction of pain," *Rhodes v. Chapman*, 452 U.S. 337 (1981), and

his First Amendment right to file non-frivolous grievances, *see Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015).[1]

In November of 2021, I dismissed some of the claims and defendants in this case, *see* ECF 57, but I determined that Mr. Thomas was entitled to discovery to try and prove his claim against Wexford Health Sources, Inc., under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), and his claims against Dr. Marlene Henze, a physician employed by Wexford and the medical director at Stateville, under the Eighth and First Amendments. Both of these defendants have now moved for summary judgment. I grant their motions for the following reasons.

I.

One of Mr. Thomas's earlier cases, *Thomas v. Gomez*, No. 17-cv-5936 (N.D. Ill.), provides relevant background to the claims he asserts here. In *Gomez*, which was likewise resolved at summary judgment, Mr. Thomas claimed that since at least March of 2015, he suffered from pain, swelling, and warmth in his left leg, and "popping" in his left knee, as a result of osteoarthritis and degenerative joint disease. *See Thomas v. Gomez*, 659 F. Supp. 3d 944, 948-49 (N.D. Ill. 2023). Numerous times between March of 2015

---

[1] *Thomas v. Pfister,* No. 18-cv-4311 (N.D. Ill.), and *Thomas v. Gomez*, No. 17-cv-5936 (N.D. Ill.), both of which were before me, similarly challenged the conduct of certain individuals and entities involved in Mr. Thomas's medical care during his custody.

and December of 2017, Mr. Thomas consulted medical providers who are not named in the present action to address these and other issues. During that time, he was prescribed ice, Tylenol, the use of a crutch, and a cortisone injection for his leg and knee. *Id*. at 949. When this treatment did not alleviate his symptoms, Mr. Thomas received an X-ray, an MRI, and physical therapy. *Id*. at 949-950. In addition, he was prescribed "twelve different medications," knee sleeves, and topical creams, and when these did not resolve his symptoms, he was referred to an orthopedic surgeon. *Id*. at 950, 951. In 2016, Mr. Thomas was referred for knee surgery. Wexford's L.R. 56.1 Stmt., ECF 114 at ¶ 7. Dr. Samuel Chmell, an orthopedic surgeon at the University of Illinois at Chicago Hospital ("UIC"), explained to Mr. Thomas that he would feel discomfort after the procedure, and that in up to 20% of cases, patients continue to experience pain for medically inexplicable reasons. *Id*. at ¶ 8. Mr. Thomas underwent total knee arthroplasty at UIC on September 24, 2019. *Id*. at ¶ 7,

In the present case, Mr. Thomas complains about defendants' treatment of his pain and other symptoms he has experienced since his knee replacement surgery. Beginning the day after his surgery, Mr. Thomas reported to Dr. Henze that he felt severe pain in his left leg, which was hot and dark red, and he faults her for failing to examine him on that day or to prescribe antibiotics. Mr. Thomas continued to experience these symptoms, and he returned to UIC for

follow-up on October 7, 2019, where he received x-rays. According to Dr. Chmell, the x-rays revealed hairline fractures that likely occurred during his knee surgery and would heal on their own in six to eight weeks. Mr. Thomas again returned to UIC for follow-up on November 18, 2019. His records from that day reflect that he presented with an increased range of motion in his knee and no evidence of infection; a well-aligned prosthesis with no evidence of hardware failure; and no fractures to his tibia or fibula. But because Mr. Thomas reported ongoing pain, Dr. Chmell recommended an MRI. Dr. Henze saw Mr. Thomas four days later, and she referred him for an MRI pursuant to Dr. Chmell's recommendation. Dr. Henze also reviewed Mr. Thomas's clinical findings and increased his doses of Tramadol and ibuprofen.

Wexford approved the MRI referral request on December 5, 2019. The procedure was scheduled for December 30, 2019, but was canceled due to Mr. Thomas's complaints of pain. Mr. Thomas ultimately underwent the MRI on January 29, 2020. It revealed "multifocal longitudinally oriented intramedullary infarcts within the proximal and distal tibial diaphysis," which Dr. Chmell considered "odd findings." Accordingly, he ordered additional tests and recommended that Mr. Thomas see another specialist for a second opinion.

Back at Stateville, Dr. Henze reviewed the MRI results with Mr. Thomas on February 3, 2020. She expressed alarm at the finding

4

of bone infarcts. Mr. Thomas recalls Dr. Henze saying that "infarcts" could cause death, blood clots, and heart attacks, and that she was not familiar with infarcts occurring in the bones. She thus made an urgent referral back to UIC to address this condition. Wexford's L.R. 56.1 Stmt., ECF 114 at ¶ 21.

Dr. Henze's urgent referral was approved, and Mr. Thomas was seen again at UIC on February 24, 2020. At that time, he was in no acute distress and had no erythema, warmth, drainage, or signs of infection. X-rays again showed a well-aligned prosthesis, no evidence of hardware failure, and no evidence of fracture. Wexford's L.R. 56.1 Stmt., ECF 114 at ¶ 22. Because of his unusual MRI findings, Dr. Chmell referred Mr. Thomas to a bone tumor specialist to rule out the possibility of cancer, although Dr. Chmell did not think a cancer diagnosis was likely. Indeed, Dr. Chmell did not believe, based on the MRI, that Mr. Thomas was in medical danger or at risk of substantial harm. *Id.* at ¶ 21; *see also* Sladek Rep., ECF 133-7 at 28 (during his care and treatment for knee and hand/wrist pain, "Mr. Thomas was never at risk for substantial harm and was not in any medical danger.")

Dr. Henze saw Mr. Thomas again on March 4 and 5, 2020. She ordered an additional MRI to the tibia/fibula and further follow up at UIC orthopedics. Dr. Henze also prescribed Tramadol and Neurontin for his pain and wrote permits for low bunk, low galley, shower daily, waist chains, ice twice per day, and slow walk. Mr.

Thomas was scheduled for an appointment with UIC's bone tumor specialist on April 20, 2020, but by that time, Covid-19 restrictions were in place, and UIC staff determined that Mr. Thomas did not meet the hospital's criteria for an in-person visit. Dr. Henze and other Stateville employees followed up to request clarification as to why Mr. Thomas could not be seen in person. Dr. Chmell explained that the risk that Mr. Thomas could contract Covid-19 and transmit it to "a vulnerable population" warranted heightened precautions. There is no dispute that neither Dr. Henze nor Wexford had authority to influence UIC's policies in this respect.

Mr. Thomas ultimately saw Dr. Yasser Farid, UIC's bone tumor specialist, on December 3, 2020.[2] Dr. Farid reviewed Mr. Thomas's MRI and clinical findings and determined that he did not, in fact, have bone infarcts, and that his MRI findings were not uncommon in patients who had undergone total knee replacement. Farid Dep., ECF 137-3, at 21:22-24; 23:8-14. Dr. Farid further testified—and, indeed, all now agree—that Mr. Thomas was not at risk of any serious medical harm between the time Dr. Chmell referred him to a bone tumor specialist and the date of his visit to Dr. Farid.

---

[2] In the meantime, Mr. Thomas saw doctors, nurses, or physician's assistants at Stateville at least six times to address his complaints of knee/leg pain. ECF 130 at ¶¶ 29-31.

But Mr. Thomas's health concerns did not abate. Roughly three weeks after Dr. Farid excluded any serious medical risk involving Mr. Thomas's leg and knee, on December 23, 2020, Mr. Thomas injured his wrist. On January 4, 2021, he complained to Dr. Henze about pain in his wrist, and she ordered an x-ray of the area, which was taken on January 6, 2021. Dr. Henze observed what appeared to be a nondisplaced fracture that was already healing. She advised Mr. Thomas at visits on January 7 and 9 that no surgery or intervention other than ice was necessary. At these visits, Mr. Thomas wore a brace on his arm that was not medically necessary and was in fact harming him because it was too small and impeding his circulation. Accordingly, she canceled his permit for the brace.

When Mr. Thomas again saw Dr. Henze about hand and wrist pain on March 26, 2021, she sent him to the emergency room. X-rays taken at the hospital showed no fractures in his hand or wrist. Because his pain persisted, Dr. Henze then ordered a CT scan of Mr. Thomas's hand and wrist, which was completed on June 29, 2021. The scan revealed tendinopathy and arthritis, for which Mr. Thomas was prescribed Voltaren gel and physical therapy. Dr. Henze later referred Mr. Thomas to a hand specialist at UIC, who saw him on December 23, 2021, concluded that his pain was likely from arthritis and the presence of a carpal boss, and established a plan of treatment that included occupational therapy and Voltaren gel. ECF 120-8 at 2172. Mr. Thomas received this therapy at

Stateville until he was discharged with a home exercise program in July of 2022. In total, Mr. Thomas was referred to and seen by providers outside of Stateville at least twenty-nine times over the period in question.

Dr. Eduard Sladek, an orthopedic surgeon who performs roughly 100 knee replacement surgeries every year, reviewed Mr. Thomas's medical records and the depositions of his treating physicians and provided an expert report in support of defendants' motions. Dr. Sladek found "no evidence in the record that Mr. Thomas was ever refused, denied, or had any delay in the medically necessary care, [or] that there was any delay in his accurate diagnosis or appropriate treatment." Sladek Rep., ECF 133-7 at 28. Dr. Sladek further opined,

> There is no evidence in this matter that Dr. Henze made any errors in medical judgment. Her care and treatment complied with the applicable standard of care for primary care physicians treating patients with the same or similar complaints following total knee replacement surgery and following complaints of wrist/hand pain.

*Id.* at 29.

## II.

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). I must view the evidence and draw all reasonable inferences in favor of Mr. Thomas, as the non-moving party. *Greeno v. Daley,* 414 F.3d 645, 652 (7th Cir.

2005). Nevertheless, Mr. Thomas must "present specific facts establishing a material issue for trial, and any inferences must rely on more than mere speculation or conjecture." *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019).

The Eighth Amendment's prohibition of cruel and unusual punishment extends to "deliberate indifference to serious medical needs of prisoners." *Brown v. LaVoie*, 90 F.4th 1206, 1212 (7th Cir. 2024) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022) (quoting *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011)). Of course, not every delay in a prisoner's medical treatment gives rise to a constitutional claim. Even outside of the prison setting, patients often must wait weeks or months for specialist appointments. "[W]hether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016), as amended (Aug. 25, 2016).

Mr. Thomas's primary Eighth Amendment theory as to Dr. Henze is that she should have done more to get him an in-person appointment with a bone specialist after UIC providers indicated that he did not meet their criteria for an in-person appointment

in April of 2020, and that she should have done more generally to treat his leg pain. With respect to Mr. Thomas's hand and wrist injury, he insists that Dr. Henze was deliberately indifferent to his condition when she initially misdiagnosed his injury as a fracture; when she removed his wrist brace and revoked his permit for same; and when she generally failed to treat his injury promptly and adequately. But no reasonable jury could find on the record here that Dr. Henze was deliberately indifferent either to Mr. Thomas's leg and knee issue or to his wrist and hand problems.

To begin, it is undisputed that the reason Mr. Thomas waited several months for his specialist appointment with Dr. Farid is that UIC determined he was not eligible for an in-person appointment under its Covid-19 protocol. Mr. Thomas complains that Dr. Henze did not "send a follow-up email" after requesting clarification as to the basis for UIC's determination, but nothing in the record suggests that anything Dr. Henze could have said would have altered that determination. Mr. Thomas further concedes that whatever Dr. Henze's initial level of concern upon reviewing the finding of "bone infarcts," his condition was never dangerous or life threatening, nor did it worsen while he waited for his specialist appointments.

As for Mr. Thomas's wrist/hand injury, while Mr. Thomas complains generally of delays and inadequate care, the record reveals that Dr. Henze referred him promptly for a variety tests

and scans in an effort to ascertain the source of his pain. When his pain did not resolve, she referred him to outside hand specialists, and she implemented the treatment plan that these specialists established. Mr. Thomas complains that Dr. Henze took away his wrist brace, yet he offers no evidence to controvert her opinion that the brace was contraindicated for his condition. Indeed, he offers nothing to contradict the opinion of defendants' expert, Dr. Sladek, that Dr. Henze's treatment of Mr. Thomas's various conditions was appropriate, reasonable, and within the standard of care. For all of these reasons, Mr. Thomas has not raised a triable issue as to whether Dr. Henze was deliberately indifferent to his serious medical condition or otherwise responsible for violating his Eighth Amendment rights.

Mr. Thomas's claim of retaliation against Dr. Henze fares no better. This claim requires him to establish that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in [Dr. Henze's] decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). His theory is that Dr. Henze retaliated against him for contacting an attorney and for filing grievances concerning his medical care by: failing to get him an earlier appointment with a bone specialist at UIC; by failing to see him; and by taking

away his crutch and his arm brace. While these facts, if true, may support a First Amendment claim, *see Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015) ("filing a non-frivolous grievance is a constitutionally protected activity sufficient to support a retaliation claim," and "denial of medical treatment is a deprivation likely to dissuade a reasonable person from engaging in future First Amendment activity"), they simply are not substantiated by the record.[3] First, it is not clear that Dr. Henze knew about Mr. Thomas's grievances, as she would have had to for those grievances to motivate her conduct. But even setting this issue aside, it appears that Dr. Henze did all she could to schedule Mr. Thomas's outside appointments. Moreover, there is no evidence that she refused to see him any time an examination was medically necessary or might have improved his condition.[4] Summary judgment of this claim is likewise appropriate.

---

[3] Mr. Thomas also argues that Dr. Henze retaliated by yelling at him and shaking her finger in his face; but if there is any authority to suggest that this type of conduct is likely to dissuade a reasonable person from engaging in protected First Amendment activity, he has not cited it.

[4] At her deposition, Dr. Henze was questioned about Mr. Thomas's allegation that she failed to see him about his knee complaints in April of 2020. She stated, "we had dealt with the infarcts and the plan of care. So there was nothing else further that I could do on site and the pandemic kind of superseded in importance the infarcts that I had already managed by referring him out." Henze Dep., ECF 137-2 at 56:17-22. Mr. Thomas offers no evidence to suggest that his condition worsened in any respect because Dr. Henze did not examine him at that point.

This leaves only Mr. Thomas's *Monell* claim against Wexford, which seeks to hold Wexford liable for violation of his Eighth Amendment rights. As a private corporation, Wexford may be liable under § 1983 only if the execution of one of its policies or customs inflicts the constitutional injury Mr. Thomas asserts. *Dean v. Wexford Health Sources, Inc.*, 18 F. 4th 214, 235 (7th Cir. 2021) (citing *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)).

To his credit, Mr. Thomas clearly identifies an ascertainable policy that he claims caused his alleged constitutional injury: "Wexford's policy of over-utilizing the UIC, which Wexford knew to cause significant delays in inmate care and which resulted in Mr. Thomas's prolonged and unnecessary pain." Resp., ECF 135 at 1. But even assuming that such a policy existed, nothing in the record suggests that it caused the injury Mr. Thomas claims. Indeed, Mr. Thomas points to no evidence suggesting that he would have been seen sooner than December of 2020 by any specialist *anywhere*. The evidence is undisputed that UIC's Covid-19 protocols are what prevented him from being seeing in person prior to December of 2020, and Mr. Thomas does not assert that other hospitals maintained materially different protocols that would have allowed him to be seen in person. Moreover, it does not appear that Mr. Thomas's plan of treatment changed in any material way after his December 2020 visit to UIC's bone specialist. Accordingly, there

13

is no reason to believe that Mr. Thomas's medical outcome or level of pain would have been any different had he been referred to a specialist willing to see him in April rather than in December.

III.

For the foregoing reasons, defendants' motions for summary judgment are granted.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: September 4, 2024